UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
_____

AMERICAN BROADCASTING
COMPANIES, INC., THE ASSOCIATED
PRESS, CABLE NEWS NETWORK,
INC., CBS BROADCASTING INC.,
FOX NEWS NETWORK, L.L.C., and
NBC UNIVERSAL, INC.,

        Plaintiffs,

v.   **PRELIMINARY INJUNCTION**
Civil File No. 08-5285 (MJD/AJB)

MARK RITCHIE, in his official
capacity as the Secretary of State of
the State of Minnesota, and LORI
SWANSON, in her official capacity as
the Attorney General of the State of
Minnesota,

        Defendants.
_____

John P. Borger, Faegre & Benson LLP, and Susan Buckley, Cahill Gordon & Reindel LLP, Counsel for Plaintiffs.

Kenneth E. Raschke, Jr. and Nathan J. Hartshorn, Minnesota Attorney General's Office, Counsel for Defendants.
_____

**I.   INTRODUCTION**

1

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction and Request for an Expedited Hearing Date and Briefing Schedule. [Docket No. 6]  The Court heard oral argument on October 9, 2008.

## II.     FACTUAL BACKGROUND

### A.     Overview of the Parties and the Claim

Plaintiffs are American Broadcasting Companies, Inc., The Associated Press, Cable News Network, Inc., CBS Broadcasting Inc., Fox News Network, L.L.C., and NBC Universal, Inc.  Plaintiffs all have conducted exit polling in the past and intend to conduct exit polling in Minnesota on November 4, 2008 through two exit polling organizations: Edison Media Research ("Edison") and Mitofsky International ("Mitofsky").

On September 29, 2008, Plaintiffs filed a Complaint against Minnesota Secretary of State Mark Ritchie and Minnesota Attorney General Lori Swanson, in their official capacities.  The Complaint contains one count alleging that, as applied to Plaintiffs, Minnesota Statute § 204C.06, subdivision 1 ("the Statute") is a violation of Plaintiffs' rights under the First Amendment of the United States Constitution.

In their current motion, Plaintiffs seek a preliminary injunction barring

enforcement of the second sentence of the Statute as applied to their exit polling activities. The Statute provides:

> **Lingering near polling place.** An individual shall be allowed to go to and from the polling place for the purpose of voting without unlawful interference. No one except an election official or an individual who is waiting to register or to vote shall stand within 100 feet of the building in which a polling place is located.

Violation of the Statute is a misdemeanor. Minn. Stat. § 645.241.

### B. Overview of Exit Polling

Plaintiffs have hired Edison and Mitofsky to conduct polls of voters at 45 selected precincts in Minnesota and elsewhere around the country on November 4, 2008. (Lenski Aff. ¶¶ 1, 22.) Exit polling is accomplished by approaching voters in a predetermined pattern as they leave the polling place after they have voted and asking them to fill out a voluntary, short, anonymous questionnaire. (Id. ¶ 5.) The reporters usually stand near the exit of the building and wear badges clearly identifying themselves as representatives of Plaintiffs' news organizations. (Id. ¶ 7.) They are instructed to not obstruct voters or interfere with the election process. (Id.)

Plaintiffs argue that the farther away a polling reporter is located from the polling place, the less reliable the information gathered. (Lenski Aff. ¶ 8.) They

claim this is because as distance from the polling place increases, the more likely it is that the reporter will not be in a position to approach a voter before the voter gets into his or her car or walks away. (Id.) Also, as distance increases, it is more difficult to determine who the voters are and to interview a preselected pattern, such as every fifth voter. (Id.) According to Edison's internal evaluation of nationwide exit polling data in 2004 and 2006, the error rates in precincts where interviewers were required to stand 100 feet or more from the polling location were more than twice the error rates in those precincts where the interviewer was able to stand within 25 feet of the polling place. (Id. ¶9; see also id. ¶¶ 30-31.)

Plaintiffs use the information from exit polls to analyze and report on voters' attitudes about issues of public concern, as well as to analyze and report on who voted for particular candidates and why. They also use it to project outcomes on election night. (Lenski Aff. ¶¶ 15-17.) After the election is over, the data is archived and used by scholars and researchers. (Id. ¶ 20.)

    C.    **Evolution of Minnesota Exit Polling Law**

In 1988, this Court issued an order enjoining enforcement of predecessor statute Minnesota Statute § 204C.06, subdivision 1 (1986), which provided: "No one, either inside a polling place or within 100 feet of the entrance to it, shall ask

a voter how the voter intends to vote or has voted on any office of question on the ballot." CBS Inc. v. Growe, 15 Media L. Rep. (BNA) 2275 (D. Minn. 1988) (Doty, J.). The Court held that the restriction was a content based place restriction because it restricted inquiry within a 100-foot radius, an area constituting a traditional public forum. Id. at 2277. The Court then concluded that the restriction was not narrowly tailored because, although Minnesota had a legitimate interest in maintaining order at the polls, the statute was over-inclusive because it banned nondisruptive exit polling. Id. at 2278. The Court held that there was a strong likelihood that the plaintiffs would succeed on the merits of demonstrating that the statute violated the First Amendment. Id. at 2279.

After entry of the Growe injunction, in 1989, the Minnesota Legislature amended the statute to, in effect, prohibit any person from standing within 100 feet of any polling place in Minnesota. However, the Secretary of State advised the Growe plaintiffs that she would interpret the term "polling place" to mean the room where the polling takes place, rather than the building. (Buckley Aff. ¶¶8-9; Ex. A to id.)

In 1993, the legislature amended § 204C.06, subd. 1, to clarify that the 100-

foot distance prohibiting standing near the entrance to a polling place was measured from the room where the polling occurs. (Buckley Aff. ¶10.)

Plaintiffs claim that during the 2004 and 2006 general elections, their exit pollsters encountered difficulties in conducting their exit polling in Minnesota. (Lenski Aff. ¶ 27.) They claim that some Minnesota election officials mistakenly required their pollsters to stand 100 feet from the buildings where polling occurred, rather than 100 feet from the rooms where the polling occurred. (Id.)

Plaintiffs' representatives contacted the Secretary of State's Office early in September to attempt to resolve the exit polling issues before the November 4, 2008 general election. (Lenski Aff. ¶¶ 24-26.) The Secretary of State's Office advised Plaintiffs that § 204C.06, subd. 1, had been amended, effective June 1, 2008, providing that no one could stand "within 100 feet of the building in which a polling place is located" and that the statute would be enforced against Plaintiffs' exit pollsters. (Lenski Aff ¶ 26.)

D.   **Effect of Minnesota Law on Other Polling Place Activities**

Minnesota Statute § 204C.06, subdivision 8, permits journalists to be inside polling places to observe voting, but prohibits them from speaking to voters while inside the polling place. Minnesota law also prevents electioneering within

100 feet of the building in which a polling place is situated.  Minn. Stat. § 211B.11, subd. 1.  Plaintiffs do not challenge either of these provisions.

## III.   DISCUSSION

### A.   Standard for Preliminary Injunction

The Eighth Circuit Court of Appeals has established the standard for considering preliminary injunctions and temporary restraining orders. Dataphase Sys. Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc ). This Court must consider (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted, (3) the public interest, and (4) the probability that the moving party will succeed on the merits.  Id.  "The very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability [of success on the merits] test."  Id. at 113.  A party, that party's agents, and persons acting in concert with the party are all bound by a temporary restraining order.  United States v. Jenkins, 974 F.2d 32, 36 (2d Cir.1992).

### B.   Likelihood of Success on the Merits

#### 1.   Proper Defendants

Defendants assert that Plaintiffs have brought suit against the wrong parties.

      **a.**      **Standard for Exception to Eleventh Amendment Immunity**

Under the Eleventh Amendment of the United States Constitution, a state is immune from suit in federal court by citizens of another state or its own citizens.  Skelton v. Henry, 390 F.3d 614, 617 (8th Cir. 2004).  However, "the Eleventh Amendment does not bar a suit against a state official to enjoin enforcement of an allegedly unconstitutional statute, provided that 'such officer [has] some connection with the enforcement of the act.'"  Reproductive Health Servs. of Planned Parenthood of St. Louis Region v. Nixon, 428 F.3d 1139, 1145 (8th Cir. 2005) (quoting Ex Parte Young, 209 U.S. 123, 157 (1908)).  "This connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit."  Los Angeles County Bar Ass'n v. Eu, 979 F.2d 697, 704 (9th Cir. 1992) (citations omitted).

      **b.**      **Discussion**

Defendants argue that Plaintiffs have no evidence that either the Minnesota Secretary of State or the Minnesota Attorney General has taken, has

threatened to take, or is authorized to take any action against them.  They claim that neither Defendant possesses the power or intention to take the alleged enforcement action.  Defendants also argue that none of the persons involved in direct enforcement of the Statute are appointed, supervised or directed by either Defendant.

The Court holds that, at this preliminary injunction stage of the proceedings, Plaintiffs have shown a sufficient connection with the enforcement of the Statute to demonstrate that Defendants are proper parties for injunctive relief.  The Secretary of State is the proper party because he is "the chief election official in the state," and because he will implement any injunction regarding election law because "if a provision of state election law cannot be implemented as a result of a court order, the Secretary of State has the authority and responsibility to 'adopt alternative election procedures.'"  Clark v. Pawlenty, 755 N.W.2d 293, 299 (Minn. 2008) (citation omitted).  Here, Plaintiffs are challenging the application of a statute that the Secretary of State, with the assistance of the Attorney General, has specifically instructed county and local officials to apply. (2008 Election Judge Guide, Ex. A to Poser Aff., at 13, 51.)  Also, as the Clark court pointed out, the Secretary of State has a statutory obligation to implement

any injunction that the Court orders.

Additionally, both the Secretary of State and the Attorney General have a statutory duty to instruct election officials on how to conduct the polling. The Secretary of State is also responsible for preparing and publishing a volume on state election laws to be furnished to the county auditors and municipal clerks. Minn. Stat. § 204B.27, subd. 2. He may also prepare detailed written instructions on complying with election laws to the auditors and clerks. Id. The Secretary of State controls the manner of the mandatory training of county auditors, election officials, and election judges. Minn. Stat. § 204B.25. The Attorney General is required to provide annotations to the Secretary of State for the election law volume. Minn. Stat. § 204B.27, subd. 2.

In sum, the Secretary of State, guided by the Attorney General, ensures the uniform statewide application of Minnesota's election laws.

    **2.    Whether § 204C.06 is Unconstitutional as Applied to Plaintiffs' Exit Polling Activities**

        **a.    Standard**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." "[H]owever, expressive activity, even in a

quintessential public forum, may interfere with other important activities for which the property is used. Accordingly, [the Supreme] Court has held that the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication." Burson v. Freeman, 504 U.S. 191, 197 (1992) (citations omitted).

### b. Restrictions on Exit Polling

There can be no doubt of the paramount importance of free political speech regarding elections:

> Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes.

Mills v. Alabama, 384 U.S. 214, 218-19 (1966). Exit polling, which involves a discussion of governmental affairs and politics as well as the media's right to gather news, is protected by the First Amendment. Daily Herald Co. v. Munro, 838 F.2d 380, 384 (9th Cir. 1988).

As Plaintiffs have noted, no court has upheld a content based law that

specifically required exit pollsters to stand a particular distance from the polling place. Here, however, the Court is confronted with a content neutral law restricting the place of expression in the form of exit polling. Plaintiffs have asserted an as applied challenge only to the Statute.

### c.     Neutrality of the Statute

The parties disagree on whether the Statute is content based, content neutral, or activity neutral and only incidentally restricting expression.

On its face, the Statute is content neutral because it prohibits everyone who is not a voter or election official from "stand[ing] within 100 feet of the building in which a polling place is located." The prohibition applies regardless of the content of the expression in which the person is engaged. The legislative history of the Statute submitted to the Court demonstrates no intent to target exit polling in particular. (See Poser Aff. ¶ 3; Lindquist Aff.; Exs. to Lindquist Aff.) There is no mention of exit polling in the legislative discussion of the Statute. Based on both the language of the Statute and the legislative history of the Statute, the Court concludes that it is content neutral.

However, the Court does not find that the Statute presents only an *incidental* restriction on expression, as urged by Defendants, because the

12

governmental purpose was not unrelated to suppression of free expression. Although the plain language of the Statute appears to apply to all persons who are not voters or election judges who stand within 100 feet of the polling building, regardless of whether they engage in expressive activity or not, the legislative history reveals a governmental interest in restricting expression. The representative of the Secretary of State explained to legislators that the intent of the Statute was not that children were barred from playing on school grounds within 100 feet of the polling building. Instead, "what this provision would do is empower election judges to make people move that shouldn't be there." (Ex. A to Lindquist Aff. at A-2.) (<u>See also</u> Ex. B to Lindquist Aff. at B-2 ("This would just give election judges the authority they need to remove people who don't need to be there."); Ex. D to Lindquist Aff. at D-1 ("This will give election judges the authority they need to move folks from interest groups like Moveon.org or others away from the polling place. . . . [T]hey're gonna use their common sense and not force the children to go to the slide instead of the swing set because of the distance, but it will give them the authority they need to move people who need to be moved.").) The legislative history demonstrates that the Statute was aimed at moving persons involved in expressive activity away from the polling

building, and not aimed generally at all persons who happened to be within 100 feet of the polling building.  Therefore, the Statute is a content neutral, but not activity neutral, regulation of the place of expressive activity.

### d.     Whether the Statute Is Narrowly Tailored

Defendants claim that Minnesota sought to prevent overcrowding and disruption at polling places.  The Court agrees that Defendants have a significant and compelling government interest in preventing overcrowding and disruption at polling locations.

Defendants also assert that the Statute is designed to simplify the tasks of election judges so that they can easily enforce one distance requirement without becoming engaged in inquiries regarding the particular type of expression in which a person is involved, such as whether a person is engaged in electioneering or is impeding access to the polls.  Defendants argue that, at busy polling places, election judges have little time, and the 2008 general election is likely to be particularly busy and involve historically high rates of voter turnout.  They claim that the Statute conserves election officials' time because they merely need to ensure that no non-voter, whether a protester, pollster, or candidate advocate, is standing within 100 feet of the building in which the polling place is

14

located.

The Court concludes that the Plaintiffs are likely to demonstrate that the Statute is not narrowly tailored. There has been no evidence presented to the Court that exit polling in any way has a detrimental effect on the orderly and corruption-free polling place. Defendants merely provide evidence of complaints regarding persons "soliciting and providing information to voters within 100 feet of the building." (Poser Aff. ¶ 9.) This evidence is not specific to exit polling. See also Burson, 504 U.S. at 207 ("[T]here is . . . ample evidence that political candidates have used campaign workers to commit voter intimidation or electoral fraud. In contrast, there is simply no evidence that political candidates have used other forms of solicitation or exit polling to commit such electoral abuses."). In fact, "[t]he presence of the press at polling places would likely serve as a deterrent to fraud and intimidation." American Broad. Co., Inc. v. Blackwell, 479 F. Supp. 2d 719, 738 (S.D. Ohio 2006). In any case, the Statute bans all exit polling within 100 feet of the polling building, not merely disruptive exit polling within 100 feet of the polling building. Nor is there any evidence that election officials have been burdened dealing with disputes regarding exit pollsters' positions near the polling building.

Additionally, Defendants already have the authority to prohibit disturbances at polling places without banning all exit polling activities within the 100-foot radius.  See Minn. Stat. § 204C.06, subd. 1 ("An individual shall be allowed to go to and from the polling place for the purpose of voting without unlawful interference.").

As for Defendants' assertion that this Statute will save election officials' time and effort by not having to engage in disputes regarding who is permitted to stand at what distance from the polling building, the legislative history undermines this alleged purpose.  The Secretary of State's representative repeatedly explained to legislators that the Statute would not require election officials to blindly enforce the 100-foot requirement but would, instead, grant those officials discretion to "remove people who don't need to be there" by using their "common sense."  In other words, the Statute grants the officials more discretion, not less.  It does not simplify officials' duties regarding enforcing requirements of distances from the polls.

### e. Whether the Statute Leaves Open Ample Alternatives for Communication

The Court concludes that the Statute does not leave open ample

alternatives for communication in the form of conducting exit polls. Under the Statute, Defendants are free to engage in exit polling in all areas more than 100 feet away from the polling buildings. However, the evidence before the Court demonstrates that locations more than 100 feet from the buildings are not reasonable alternatives. Defendants have not offered any evidence to refute Plaintiffs' evidence that exit polls conducted 100 feet away from polling places produce substantially less reliable results. Forcing exit pollsters to stand 100 feet from the polling building significantly impedes their ability to identify and approach voters in a predetermined pattern. Therefore, Defendants have failed to show that Plaintiffs have "ample alternatives" to engage in their protected expression if the Statute is enforced.

Overall, Plaintiffs are likely to succeed on the merits of their claim that, as applied to Plaintiffs' exit polling activities, the Statute violates the First Amendment.

### C. Irreparable Harm

Because Plaintiffs have established "a substantial likelihood of success on the merits of [their] First Amendment claim, [they] . . . also have established irreparable harm as the result of the deprivation." Phelps-Roper v. Nixon, 509

F.3d 480, 485 (8th Cir. 2007) (citation omitted).  Specifically, Plaintiffs face irreparable harm if the injunction is not granted because enforcement of the Statute would restrict their First Amendment rights and result in the loss of accurate and valuable voter information during this historic election year.

### D. Balance of the Harms

Defendants assert that any order changing the operation of Minnesota election law would cause undue hardship for 30,000 election judges who serve 4,130 precincts.  (Poser Aff. ¶ 4.)  They will be required to learn and apply a new set of requirements in a short period of time.  Defendants assert that this will cause complications and decrease polling efficiency.

Plaintiffs have presented evidence that enforcement of the distance requirements in the new law will destroy their ability to conduct effective exit polls.  Additionally, there is no evidence that permitting exit pollsters close to the polling building will disrupt the electoral process.  Finally, through enforcement of the first sentence of Minnesota Statute § 204C.06, subdivision 1, Minnesota has other authority to protect voters' right to be free from unlawful interference.  The harms faced by Plaintiffs in the absence of an injunction far outweigh the inconvenience faced by Defendants in having to inform election officials of this

injunction.

### E.     Public Interest

The public has a fundamental interest in unfettered debate of public issues and governmental affairs.  As Defendants note, the public also has an interest in a fair and orderly election, and there is no reason to believe that this injunction will interfere with that interest.  The public interest weighs in favor of granting the injunction.

### F.     Conclusion and Bond

Because all four <u>Dataphase</u> factors weigh in favor of granting Plaintiffs' motion, the Court issues the following Preliminary Injunction.  The Court concludes that no bond is required because the injunction will cause no monetary harm to Defendants.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

> Plaintiffs' Motion for a Preliminary Injunction and Request for an Expedited Hearing Date and Briefing Schedule [Docket No. 6] is **GRANTED** as follows:
>
> 1.     Defendants, their officers, agents, and employees, and any person in active concert or participation with them who receives actual notice of this Preliminary Injunction by personal service or otherwise, are

       hereby enjoined from enforcing the second sentence of Minn. Stat. § 204C.06, subd. 1, as against Plaintiffs' exit polling activities or from prohibiting Plaintiffs or their agents, under the authority of Minn. Stat. § 204C.06, subd. 1, from conducting exit polls within 100 feet of Minnesota polling places on November 4, 2008, the day of the general election, and pending the entry of a final judgment in this action.

2.    The Secretary of State shall forthwith advise all County Auditors that Plaintiffs and their agents are permitted to engage in exit polling activities within 100 feet of polling places on November 4, 2008, provided that their activities do not otherwise violate Minnesota or federal law or unlawfully interfere with individuals going to and from the polling place for the purpose of voting. The Secretary of State shall forthwith notify all County Auditors of the entry and terms of this Preliminary Injunction.

3.    The term "exit polling" as used in this Preliminary Injunction is defined as approaching voters in a predetermined pattern as they leave the polling place after they have voted and asking them to fill out an anonymous questionnaire.

4.    Plaintiffs will not be required to provide security.

5.    This Preliminary Injunction shall be effective immediately.

Dated: October 15, 2008                        s/ Michael J. Davis
                                                         Michael J. Davis
                                                         Chief Judge
                                                         United States District Court